940 A.2d 1173

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. CHARLES A. WATKINS III, DEFENDANT–RESPONDENT.

Argued November 13, 2007—Decided February 21, 2008.

508

511

512

*Leslie–Ann M. Justus,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Ruth Bove Carlucci,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LONG delivered the opinion of the Court.

The primary purpose of Pretrial Intervention (PTI) is to assist in the rehabilitation of worthy defendants, and, in the process, to spare them the rigors of the criminal justice system. Eligibility is broad and includes all defendants who demonstrate the will to effect necessary behavioral change such that society can have confidence that they will not engage in future criminality. *N.J.S.A.* 2C:43–12e. However, all defendants are not worthy candidates. Indeed, those who have committed serious and heinous crimes are generally recognized as problematic from a rehabilitation standpoint. Thus, the PTI Guidelines embodied in Rule 3:28 incorporate a presumption against admission for certain classes of offenses. At issue on this appeal is the scope of Guideline 3(i)(2), which applies the presumption to an offender whose crime was "part of a continuing criminal business or enterprise."

The case centers on a defendant who continued to receive and negotiate unemployment checks for four months after he resumed work and became ineligible for such benefits. The prosecutor rejected defendant's application primarily because his offense constituted a "continuing criminal enterprise." The trial judge agreed. The Appellate Division reversed and remanded for further proceedings on the ground that defendant's four-month odyssey into criminality was not long enough to satisfy the continuing criminal enterprise standard.

We now affirm the judgment of the Appellate Division although on slightly different grounds. Our review of the text, history and

purposes of the statute and Guidelines has led us to conclude that the "part of a continuing criminal business or enterprise" category, like the other prongs of Guideline 3(i), generally was intended by the drafters to encompass serious or heinous crimes that are elements of a larger commercial scheme perpetrated by persons acting in concert for material financial gain. So defined, an individual who, on his own, has simply committed a series of similar crimes is not "part of a continuing criminal business or enterprise" warranting presumptive exclusion from PTI.

That is not to suggest that an offender who has acted alone or whose crimes were not perpetrated over a long period of time must be admitted into PTI, only that the presumption against admission in Guideline (3)(i)(2) is not the starting point. Rather, the defendant's potential for rehabilitation should be evaluated under the statutory criteria (*N.J.S.A.* 2C:43–12e) and the Guidelines without a presumption either way.

I

In May 1998, defendant Charles Watkins III was temporarily laid off from his position at the Trenton Psychiatric Hospital and began receiving unemployment benefits. Subsequently, he obtained an extension of those benefits in order to enroll in the Culinary Arts Program at Mercer County Community College under the "Additional Benefits During Training Program" (ABT). The ABT allows an eligible unemployed individual already receiving benefits to have those benefits extended while pursuing education or job-training skills designed to further that individual's employment prospects.

At some point prior to January 23, 1999, Watkins returned to work, but did not report his employment to the Department of Labor, as required by the program. Had he done so, the ABT benefits would have ended. Instead, between January 23, 1999, and May 22, 1999, Watkins was enrolled in school, attending courses, working, and continuing to collect benefits under the ABT.

During that time period, Watkins cashed nine unemployment checks totaling $5,670. Each check required him to certify that he was unemployed, which was not the case. Watkins continued his training in culinary arts at Mercer County Community College. He opened the first culinary cafeteria at the college, as well as an off-site catering business operated through the hospital. Watkins submitted his last certification to the Department of Labor on May 24, 1999, and cashed his last check on June 2, 1999. On June 4, 1999, he received a culinary technician certificate of completion from the Career Training Institute of Mercer County Community College. Ultimately, Watkins completed a program through Rutgers University, from which he graduated with honors.

The Department of Labor discovered Watkins's unlawful receipt of benefits and gave him an opportunity to be heard and to pay what he owed. Inexplicably, Watkins did not appear, nor did he respond to further demands for repayment. Thereafter, he was warned by the Attorney General of a potential criminal prosecution. Again, Watkins did not respond and at no time did he offer to, nor did he, in fact, make any meaningful effort to repay his debt.

In January 2004, Watkins was indicted on one count of third-degree theft by deception, *N.J.S.A.* 2C:20–4, and one count of fourth-degree unsworn falsification to authorities, *N.J.S.A.* 2C:28–3a. He applied for admission into the Mercer County PTI program. In April 2004, the prosecutor rejected the application, citing three factors: (1) that Watkins's crime, which occurred over a four-month period and involved nine separate checks, constituted a continuing criminal enterprise under Guideline 3(i)(2); (2) that previously Watkins had been convicted in municipal court for receiving stolen property; and (3) that Watkins's status as a public employee warranted denial.

Watkins appealed and two hearings followed. After some procedural maneuvering that need not be recounted here, the State properly withdrew its reliance on Watkins's public employment as

a basis for rejection.[1] Instead, the State relied exclusively on Watkins's fourteen-year-old municipal court conviction and its characterization of his offense as a "continuing criminal enterprise." The trial judge denied Watkins relief, determining that the State's decision was not arbitrary or capricious in light of the existence of those two grounds.

On February 7, 2005, Watkins entered a conditional guilty plea to third-degree theft by deception, and on April 15, 2005, he was sentenced to three years' probation conditioned on payment of the money he owed the State. The remaining count of the indictment was dismissed in accordance with the plea agreement. Watkins appealed.

In a published opinion, the Appellate Division reversed and remanded the case to the prosecutor for reconsideration, rejecting the conclusion that Watkins's crime constituted a "continuing criminal enterprise." Noting that Guideline 3(i)(2) does not define its terms, and that the phrase "continuing criminal business or enterprise" has not been interpreted consistently, the panel held that the words must be read as a unit and that four months was an insufficiently long period of time to transform a series of unlawful acts committed for profit into a continuing criminal enterprise. In remanding, the panel noted that "[o]ur conclusion does not mean that defendant is automatically entitled to PTI admission," simply that the prosecutor needs to reconsider defendant's application without taking Guideline 3(i)(2) into account.

We granted the State's petition for certification. 190 *N.J.* 393, 921 *A.*2d 447 (2007).

## II

The State argues that the Appellate Division failed to accord appropriate deference to the prosecutor's decision; that because

---

[1] Public employment is not a relevant consideration unless a defendant's offense touches on that employment. *L.* 2007, *c.* 49, § 9.

Watkins committed a "series of transactions over a period of time" they constituted a continuing criminal business or enterprise; and that the denial of Watkins's PTI application was not a patent and gross abuse of discretion.

Watkins counters that his offense should not have subjected him to *"per se* disqualification" under Guideline 3(i)(2) and that, even if it was a part of a continuing criminal business or enterprise, his denial was a patent and gross abuse of discretion warranting our intervention.

### III

■ PTI is a procedural alternative to the traditional process of prosecution and punishment of defendants. *State v. Leonardis,* 71 *N.J.* 85, 89, 363 *A.*2d 321 (1976). The program was first established by rule in 1970, without an enabling statute, in connection with a municipal work-release program. *Leonardis, supra,* 71 *N.J.* at 103, 363 *A.*2d 321. By 1976, PTI had expanded to twelve counties. Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 3:28 (1995). That year, the Court promulgated uniform Guidelines to regularize PTI practices in all venues.

In 1979, the Legislature enacted a statewide PTI program as part of the revised Code of Criminal Justice. *See N.J.S.A.* 2C:43–12 to –22. Thus, for nearly three decades, PTI has been governed simultaneously by the Rule and the statute which "generally mirror[ ]" each other. *State v. Wallace,* 146 *N.J.* 576, 582, 684 *A.*2d 1355 (1996) (citing *State v. Nwobu,* 139 *N.J.* 236, 245, 652 *A.*2d 1209 (1995)).

■ The purposes underlying PTI are set forth in the statute:
(1) Provide applicants, on an equal basis, with opportunities to avoid ordinary prosecution by receiving early rehabilitative services or supervision, when such services or supervision can reasonably be expected to deter future criminal behavior by an applicant, and when there is apparent causal connection between the offense charged and the rehabilitative or supervisory need, without which cause both the alleged offense and the need to prosecute might not have occurred; or (2) Provide an alternative to prosecution for applicants who might be harmed by the imposition of criminal sanctions as presently administered, when such an

alternative can be expected to serve as sufficient sanction to deter criminal conduct; or

(3) Provide a mechanism for permitting the least burdensome form of prosecution possible for defendants charged with "victimless" offenses; or

(4) Provide assistance to criminal calendars in order to focus expenditure of criminal justice resources on matters involving serious criminality and severe correctional problems; or

(5) Provide deterrence of future criminal or disorderly behavior by an applicant in a program of supervisory treatment.

[*N.J.S.A.* 2C:43–12a.]

At heart, PTI, like all diversionary projects, has both rehabilitative and administrative aims. As we have often noted, however, the goal of expeditious disposition is "subordinate to the rehabilitative function of PTI." *Leonardis, supra,* 71 *N.J.* at 98, 363 *A.*2d 321 (citing *People v. Reed,* 37 *Cal.App.*3d 369, 112 *Cal.Rptr.* 493 (Ct.App.1974) (noting overriding purpose of PTI to effect rehabilitation; relief to judicial system is collateral benefit of process)). In turn, the rehabilitative goal

is founded to a large extent upon the eligibility criteria which determine admissions to the program. These criteria must mediate between the conflicting interests which underlie PTI. On the one hand, the eligibility criteria must be sufficiently broad to divert as many cases as could possibly benefit from the program consistent with public security. On the other hand, the criteria must be sufficiently discriminatory to assure selection of those applicants who have the best prospects for rehabilitation.

[*Leonardis, supra,* 71 *N.J.* at 100, 363 *A.*2d 321.]

Indeed "[e]libigility for PTI is broad enough to include all defendants who demonstrate sufficient effort to effect necessary behavioral change and show that future criminal behavior will not occur. Any defendant accused of crime shall be eligible for admission into a PTI program." *R.* 3:28, Guideline 2.

The statutory criteria for eligibility, which are incorporated by reference into the Guidelines, are wide-ranging and provide for consideration of an array of factors:

(1) The nature of the offense;

(2) The facts of the case;

(3) The motivation and age of the defendant;

(4) The desire of the complainant or victim to forego prosecution;

(5) The existence of personal problems and character traits which may be related to the applicant's crime and for which services are unavailable within the criminal justice system, or which may be provided more effectively through supervisory treatment and the probability that the causes of criminal behavior can be controlled by proper treatment;

(6) The likelihood that the applicant's crime is related to a condition or situation that would be conducive to change through his participation in supervisory treatment;

(7) The needs and interests of the victim and society;

(8) The extent to which the applicant's crime constitutes part of a continuing pattern of anti-social behavior;

(9) The applicant's record of criminal and penal violations and the extent to which he may present a substantial danger to others;

(10) Whether or not the crime is of an assaultive or violent nature, whether in the criminal act itself or in the possible injurious consequences of such behavior;

(11) Consideration of whether or not prosecution would exacerbate the social problem that led to the applicant's criminal act;

(12) The history of the use of physical violence toward others;

(13) Any involvement of the applicant with organized crime;

(14) Whether or not the crime is of such a nature that the value of supervisory treatment would be outweighed by the public need for prosecution;

(15) Whether or not the applicant's involvement with other people in the crime charged or in other crime is such that the interest of the State would be best served by processing his case through traditional criminal justice system procedures;

(16) Whether or not the applicant's participation in pretrial intervention will adversely affect the prosecution of codefendants; and

(17) Whether or not the harm done to society by abandoning criminal prosecution would outweigh the benefits to society from channeling an offender into a supervisory treatment program.

[*N.J.S.A.* 2C:43–12e.]

■ Although the admission criteria are broad, defendants who have committed certain crimes are viewed as problematic from a rehabilitation perspective and are subject to special treatment. Guideline 3 takes a nuanced, although not a categorical approach to such offenders:

If the crime was (1) part of organized criminal activity; or (2) part of a continuing criminal business or enterprise; or (3) deliberately committed with violence or threat of violence against another person; or (4) a breach of the public trust where admission to a PTI program would deprecate the seriousness of defendant's crime, the defendant's application should generally be rejected. A defendant charged with a first or second degree offense or sale or dispensing of Schedule I or II

narcotic drugs as defined in L.1970, c. 226 (N.J.S.A. 24:21–1 et seq.) by persons not drug dependent, should ordinarily not be considered for enrollment in a PTI program except on joint application by the defendant and the prosecutor.
[*R.* 3:28, Guideline 3(i).]

The effect of that Guideline is to create a "presumption against acceptance" into PTI for defendants whose crimes fall within the enumerated categories. *State v. Baynes,* 148 *N.J.* 434, 442, 690 A.2d 594 (1997). To overcome "the presumption against PTI, defendant must establish 'compelling reasons' for admission" to the program. *Nwobu, supra,* 139 *N.J.* at 252, 652 A.2d 1209.

In making a PTI determination, the prosecutor must assess a defendant's "amenability to correction" and potential "responsiveness to rehabilitation." *N.J.S.A.* 2C:43–12b. Such assessments are individualized, *State v. Sutton,* 80 *N.J.* 110, 119, 402 A.2d 230 (1979), and are dependent on a host of factors including the details of the case, defendant's motives, age, past criminal record, standing in the community, and employment performance, to name a few. *N.J.S.A.* 2C:43–12e.

In order to overturn a prosecutor's rejection, a defendant must "clearly and convincingly establish that the prosecutor's decision constitutes a patent and gross abuse of discretion." *State v. Watkins,* 390 *N.J.Super.* 302, 305–06, 915 A.2d 561 (App.Div. 2007) (citing *State v. Negran,* 178 *N.J.* 73, 82, 835 A.2d 301 (2003); *Nwobu, supra,* 139 *N.J.* at 246, 652 A.2d 1209; *State v. Motley,* 369 *N.J.Super.* 314, 321, 848 A.2d 875 (App.Div.2004)). A patent and gross abuse of discretion is defined as a decision that "has gone so wide of the mark sought to be accomplished by PTI that fundamental fairness and justice require judicial intervention." *Wallace, supra,* 146 *N.J.* at 582–83, 684 A.2d 1355 (quoting *State v. Ridgway,* 208 *N.J.Super.* 118, 130, 504 A.2d 1241 (Law Div.1985)).

Defendant generally has a heavy burden when seeking to overcome a prosecutorial denial of his admission into PTI. *Nwobu, supra,* 139 *N.J.* at 246–47, 652 A.2d 1209. However, where the prosecutor has made a legal error, there is a relatively low threshold for judicial intervention because "[t]hese instances

raise issues akin to questions of law, concerning which courts should exercise independent judgment in fulfilling their responsibility to maintain the integrity and proper functioning of PTI as a whole." *State v. Dalglish*, 86 *N.J.* 503, 510, 432 *A.2d* 74 (1981). That is the backdrop for our inquiry.

## IV

The fundamental question before us is whether the prosecutor properly characterized Watkins's unlawful receipt of unemployment checks as part of a continuing criminal business or enterprise. If that characterization was correct, Watkins faced a presumption against acceptance and bore the affirmative burden of demonstrating compelling reasons for admission. If it was incorrect, Watkins should not have been required to demonstrate compelling reasons for admission and a remand would be in order for a reevaluation of his application under the proper standards. Because that is a purely legal question, the patent and gross abuse of discretion standard is not implicated in its disposition.

We agree with the Appellate Division that the meaning of "part of a continuing criminal business or enterprise" is unclear and that our case law has thus far not been helpful in explicating the term. Indeed our opinions do not adopt a uniform template for applying Guideline 3(i)(2). For example, in *State v. Bender*, which involved a defendant who stole cocaine from his employer's drugstore over four years, we held that the crimes were not part of a continuing criminal business or enterprise because they did not involve "commercial overtones" and were not perpetrated for the purpose of enriching him "in some material way." 80 *N.J.* 84, 95, 402 *A.2d* 217 (1979). Although he clearly victimized his employer by stealing a significant amount of inventory and enriched himself by obtaining drugs that he would otherwise have had to pay for, because of his drug habit, we concluded that his crime was not part of a continuing business or enterprise.

On the contrary, in *Sutton, supra*, we held that the crime perpetrated by a defendant who engaged in a four-and-one-half

year welfare fraud to feed and support her family had "commercial overtones" and was part of a continuing criminal business or enterprise. Unlike *Bender*, we did not consider defendant's motives in assessing whether her crime subjected her to the presumption.

In *Nwobu, supra*, we found that defendant's six-week fraud (he stole and negotiated over $75,000 in checks from his employer) may not have satisfied Guideline 3(i)(2) because ordinarily such a scheme "is predicated on more long-standing criminal involvement." 139 *N.J.* at 251, 652 *A.*2d 1209. We nonetheless affirmed the prosecutor's denial of defendant's PTI application because he had committed a second-degree fraud which subjected him, in any event, to a presumption against admission.

*Nwobu* and *Bender* cannot be reconciled with the State's definition of a continuing criminal business or enterprise-a course of conduct "involving a series of transactions continuing over a period of time." *State v. Imbriani*, 280 *N.J.Super.* 304, 318, 654 *A.*2d 1381 (Law Div.1994) (quoting *State v. Marie*, 200 *N.J.Super.* 424, 429, 491 *A.*2d 784 (Law Div.1984)) *aff'd*, 291 *N.J.Super.* 171, 677 *A.*2d 211 (App.Div.1996). If that is the standard, neither *Bender* nor *Nwobu* is explainable. Both cases clearly met the State's definition, yet neither was held to constitute part of a continuing criminal business or enterprise. *Bender* added "commercial overtones" and enrichment "in a material way" and *Nwobu* declared defendant's six-week fraud not "long-standing" enough despite the fact that he stole over $75,000 worth of checks in numerous separate transactions.

Those cases suggest that "part of a continuing criminal business or enterprise" has a meaning other than "a series of transactions continuing over a period of time." To divine that meaning, we look to the statute, the aims underlying Guideline 3, the words of Guideline 3(i)(2) and the other prongs for enlightenment.

As we have said, although there are no categorical exclusions from PTI, *Baynes, supra*, 148 *N.J.* at 445, 690 *A.*2d 594, the scheme contemplates that some offenders will generally be reject-

ed because the nature of their crimes engenders doubt regarding their potential for rehabilitation and because the public interest would not be served by allowing them the benefits of diversion.

Those defendants are subject to the presumption against admission in Guideline 3. They include, among others, violent criminals 3(i)(3); persons who breach the public trust 3(i)(4); first- and second-degree offenders whose crimes bear a presumption of incarceration; and those non-drug addicted individuals who sell Schedule I and II narcotics for profit. What those offenders have in common is that they have committed crimes that are, by their very nature, serious or heinous and with respect to which the benefits of diversion are presumptively unavailable. *See Report of the Supreme Court Committee on Pretrial Intervention,* 108 *N.J.L.J.* 486 (1981) ("[I]t is the general consensus of most practitioners that certain offenses are of such a serious and heinous nature, that the offense by itself tips the balance toward exclusion.").

To the extent that the Guideline was intended to capture serious or heinous offenses, it is a given that the remaining prongs— Guideline 3(i)(1) ("part of organized criminal activity") and Guideline (3)(i)(2) ("part of a continuing criminal business or enterprise")—were considered serious or heinous by the drafters.

However, those prongs are different from their counterparts insofar as they apply the presumption to individual acts that may not be particularly serious or heinous in themselves but rise to that level because they are "part of" an overarching sinister web. The words "part of," which are barely mentioned by the parties and the courts below, are the critical path to understanding those prongs. "Part of" means that defendant's crime must be an element, fragment, section, or segment of a greater whole that exists beyond the defendant's individual infractions.

Thus, for example, a defendant's bookmaking offenses, though not serious or heinous in themselves, will be captured by Guideline 3(i)(1) if they are part and parcel of the activities of an organized

crime organization. Likewise, Watkins's third-degree theft and fourth-degree unsworn falsification charges will trigger the presumption if they are "part of a continuing criminal business or enterprise."

The State argues that Watkins engaged in a series of transactions "continuing" over a period of time and that is the purport of Guideline 3(i)(2). We disagree. The language the drafters chose was pointed and specific and simply does not support that view. It does not interdict repetitive criminal activity by a defendant. Rather, what it requires is that defendant's crime or crimes be a "part of" an ongoing criminal business or enterprise. What needs to be "continuing" is not defendant's activity but the criminal business or enterprise of which his crimes are a segment. It is their place in the continuing criminal business or enterprise that makes defendant's acts serious or heinous.

What is a continuing criminal business or enterprise? The intuitive answer—a traditional organized crime operation—is not correct. Those organizations are specifically targeted by Guideline 3(i)(1). Guideline 3(i)(2) obviously was intended to have a different reach. "Business or enterprise" are the key words. In common parlance business describes a number of models, all related to commerce, which in turn, denotes the interchange of goods or services for profit among persons and entities in society. That is the likely genesis of *Bender's* proper introduction of "commercial overtones" and material financial enrichment into the Guideline 3(i)(2) calculus.

The State's suggestion is that Watkins was in the continuing criminal business of cheating the Department of Labor because he did it more than once. We disagree. If merely committing thefts serially was the focus of Guideline 3(i)(2) it would have been simple for the drafters to say so. They could have used the State's formulation—"a series of transactions continuing over a period of time"—or simply declared that repetitive criminal acts were in their crosshairs. Instead, they used rather specific language and, in particular, tethered business and enterprise. That

linkage is enlightening. *See U.S. v. CDMG Realty,* 96 *F.*3d 706, 714 (3rd Cir.1996) (stating under maxim of *"noscitur a sociis,"* the meaning of term in enactment derives from context); *see also State v. Afanador,* 134 *N.J.* 162, 172, 631 *A.*2d 946 (1993) (meaning ascribed to words in statute may be indicated or controlled by the words with which it is associated) (citation omitted).

A criminal enterprise normally involves the activities of more than one person. *United States v. Benny,* 786 *F.*2d 1410, 1415–16 (9th Cir.1986) ("Thus, if an individual had no employees or other associates it strains the imagination to say that the individual associated with an enterprise comprised solely of himself or herself. That is the same as saying you can conspire with yourself."); *State v. Kuklinski,* 234 *N.J.Super.* 418, 420, 560 *A.*2d 1295 (Law Div.1988) (holding enterprise must be more than activities of single person).

Indeed, the federal Continuing Criminal Enterprise statute, 21 *U.S.C.* § 848, actually defines a "continuing criminal enterprise":

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if-

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter-

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

 We assume that the drafters were aware of those meanings ascribed to the word "enterprise" in 1976 when the Guidelines were drafted and that they broadly supply a framework for interpreting the "part of a continuing criminal business or enterprise" language—that is, that defendant's crime must be an element of a coordinated criminal plan or scheme involving persons (more than one) acting in concert to generate material financial benefit. That approach is consistent with the Legislature's later expressed concern over "[w]hether or not the applicant's involvement with other people in the crime charged or in other crime is such that the interest of the State would be best

served by processing his case through traditional criminal justice system procedures[.]" *N.J.S.A.* 2C:43–12e(15).[2] It is also consistent with the commercial overtones and material financial benefit notions of *Bender*.[3]

We conclude therefore, by way of example, that employees acting in concert over a long period of time to embezzle money from an employer, although not part of a traditional organized crime organization, satisfy Guideline 3(i)(2) and are subject to the presumption against admission. On the contrary, with the exception of the *Sutton* type case involving long-standing criminality, individuals acting alone in furtherance of their own criminal interests, who commit a series of offenses such as thefts or forgeries, are not within the contemplation of Guideline 3(i)(2) because they are not part of a larger whole and are not acting in concert with others.

---

[2] That criterion reflects substantive concerns over persons acting together to commit crimes. It is distinct from *N.J.S.A.* 2C:43–12e(16) which addresses whether or not the applicant's participation in PTI will adversely affect the prosecution of co-defendants.

[3] In *State v. Sutton*, which we decided on the same day as *Bender*, several years after the Guidelines were adopted, we concluded that defendant's four-and-one-half-year welfare fraud involved commercial overtones and was part of a continuing criminal business or enterprise. Sutton acted alone and thus fell outside of the heartland of cases that Guideline 3(i)(2) was intended to address. However, our decision in that case reflects our conclusion that an alternative class of offenses is swept in by Guideline 3(i)(2): those that are perpetrated by a defendant, acting alone, that continue for such a lengthy period of time that they reflect a level of planning or deliberation that the drafters likely considered more serious than mere repetitive conduct and emblematic of a frame of mind not conducive to rehabilitation. Obviously we thought Sutton's fraud satisfied that standard. We continue to adhere to that view and to recognize that the length of time during which a defendant's criminal acts are perpetrated can vault a defendant, who acts alone, over the Guideline 3(i)(2) threshold. Obviously, as the Appellate Division noted, Watkins's four-month theft would not pass muster. Equally obvious is that Sutton's four-and-one-half-year fraud satisfies the standard. Each case will require a fact specific analysis with the number of violations, the period of criminality and the extent of the commercial losses as part of the Guideline 3(i)(2) calculus.

 That is not to suggest that such an individual offender must be admitted to PTI, only that he is not within this presumptively excluded class.[4] In the absence of a presumption, all other factors bearing on a defendant's potential for rehabilitation will still require analysis and a denial may be based on legitimate negatives in the applicant's past, including by way of example but not limitation, prior record and lack of remorse. Further, the extent of the theft activities and length of time during which they were perpetrated are relevant criteria that fall within the statutory "pattern of anti-social behavior" standard. Those, among others, are legitimate considerations and if the prosecutor finds that they demonstrate a lack of amenability to rehabilitation, a denial will be warranted.

Because Watkins's offenses were not part of a continuing criminal business or enterprise, he was not subject to the presumption against admission to PTI. His amenability to correction and responsiveness to rehabilitation therefore should be assessed *de novo* without the presumption.

## V

The Judgment of the Appellate Division is affirmed. The matter is remanded to the prosecutor for disposition in light of the principles to which we have adverted.

*For affirmance/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

[4] Plainly other presumptions may apply. For example, a defendant acting alone may cause financial losses to his victim that raise his crime to first- or second-degree. He may likewise breach a public trust or commit his offenses with a threat of force or violence. Each of those instances would subject him to a different presumption against admission to PTI.